## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| **CARLOS LEGASPY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **Case No.** |
| **v.** | ) | |
| | ) | |
| **FINANCIAL INDUSTRY** | ) | |
| **REGULATORY AUTHORITY, INC., a** | ) | |
| **Delaware not-for-profit corporation,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NOW COMES Plaintiff Carlos Legaspy ("Legaspy"), by and through his undersigned attorney, and for his complaint against the Defendant, Financial Industry Regulatory Authority, Inc. ("FINRA"), a Delaware not-for-profit corporation, states as follows:

### JURISDICTION AND VENUE

1. FINRA is a Delaware not-for-profit corporation with its principal place of business in New York City, New York and with offices in Chicago, Illinois.

2. Legaspy is and, at all times relevant hereto was, a citizen of the State of Illinois who is registered as an associated person of Insight Securities, Inc, ("Insight") with FINRA and is, and at all times relevant hereto was, subject to FINRA's rules, in particular the obligation to arbitrate claims filed by customers pursuant to FINRA's Code of Arbitration.

3. This is an action arising out of the laws of the United States of America and involves a federal question and, therefore, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.

4 .     The amount in controversy exceeds $75,000 exclusive of legal fees and costs and, therefore, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332.

5 .     The impact of the acts and omissions herein alleged have accrued to Plaintiff's detriment in Cook County, Illinois. Therefore, venue is properly vested in the United states District Court for the Northern District of Illinois, Eastern Division.

## THE REGULATORY STRUCTURE

1 .     The Securities Exchange Act of 1934, 15 U.S.C. §§ 78a *et seq.* (Exchange Act), provides a comprehensive system of federal regulation of the securities industry.

2 .     The Maloney Act, Pub. L. No. 75-719, 52 Stat. 1070 (1938) (amending the Exchange Act, 15 U.S.C. §§ 78o *et seq.*), established extensive guidelines for the formation and oversight of self-regulatory organizations, such as FINRA.

3 .     Congress delegated power to these organizations to enforce, at their own initiative, compliance by members of the industry with the requirements laid down in the Exchange Act and the regulations promulgated thereunder.

4 .     Pursuant to the Maloney Act, any association of securities broker-dealers seeking to register as a "national securities association" must file with the S.E.C. an application for registration ... containing the rules of the association." 15 U.S.C. §§ 78o-3(a).  Furthermore, an association must "comply with the [Exchange Act] and its own rules," (*id.* § 78s(g)(1)(A)) and must "enforce compliance ... by its members and persons associated with its members." *Id*; *see also* 15 U.S.C. Sec. 78s(h).

5 .     Although a national securities association is a self-regulatory entity, it remains subject to the S.E.C.'s oversight and control. *Id.* § 78s(b). FINRA is subject to extensive oversight,

supervision, and control by the S.E.C. on an ongoing basis. 15 U.S.C. Sec. 78s(a)(3)(B). For example, any proposed change in the association's rules must be filed with the S.E.C. and no proposed rule change can take effect unless approved by the SEC. *Id.* § 78s(b)(1).

6. Furthermore, the S.E.C. may abrogate, add to, and delete from the rules of a self-regulatory organization as the S.E.C. deems necessary or appropriate to insure the fair administration of the self-regulatory organization or to conform its rules to requirements of the federal securities laws. *Id.* § 78s(c).

7. Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 (15 U.S.C. 78s(b)(1)) ("Exchange Act") and Rule 19b-4 thereunder (17 CFR 240.19b-4), a proposed rule change to amend FINRA's Code of Arbitration Procedure for Customer Disputes and Code of Arbitration Procedure for Industry Disputes (collectively, the "Codes") must be approved by the S.E.C.

8. FINRA, as the successor of the National Association of Security Dealers ("NASD"), is the only officially registered "national securities association'" under the Exchange Act.

9. Registered representatives such as the Plaintiff are required to register with FINRA and are subject to its rules.

10. All broker/dealers are required to register with FINRA and are, likewise, subject to its rules.

11. When FINRA promulgates and enforces its rules, FINRA is acting in a quasi-governmental capacity with the full force and authority of the United States Government and its actions in so doing are, therefore, governmental actions and, as such, are subject to the constraints

imposed by the Due Process Clause of the Fifth Amendment to the Constitution of the United States.

12.     Therefore, when FINRA interprets or enforces its rules in such a manner as to deprive a member of his or her rights under the Constitution and laws of the United States or changes its rules without obtaining S.E.C. approval for such change that, in turn, contravenes the rights of a registered person, the registered representative, such as Legaspy, has the right to seek both a declaration from this Court that such action by FINRA is null and void and to obtain an order restraining FINRA from further violating the rights of that registered person, in this instance, Legaspy.

## FACTUAL BACKGROUND

13.     In February 2019, two former Insight customers, Alberto Jose Nieves and Gladys Veronica Anton ("The Nieves"), filed a FINRA arbitration, Arb. No. 19-00474 ("the Arbitration"), against Legaspy, Insight, and Pershing LLC ("Pershing"), Insight's clearing firm, seeking $2,765,000 plus lost interest, dividends and lost appreciation for their Insight account.

14.     The Nieves are citizens of Argentina an do not speak English who will require an interpreter though out the entirety of the evidentiary hearing, which the Arbitration Panel set to commence on August 17, 2020 in Bocca Raton, Florida.

15.     As a result of the Covid-19 Pandemic, FINRA subsequently suspended all in-person evidentiary hearings set to convene pursuant to FINRA Arb. Rule 133213(a). Indeed, on June23, 2020 FINRA *informed the parties that the August 2020 hearing had been postponed.  See* Exhibit "A" hereto.

4

16.     Thereafter, the Arbitration Panel, over Legaspy's objection entered order stating, that *despite the previous cancellation of the hearing*, the hearing would nonetheless proceed on August 17, 2020.  The order states in pertinent part:

a.  " . . .FINRA has decided to administratively postpone all *in-person* arbitration and mediation proceedings scheduled through September 4, 2020. Although the Memorandum states that the hearings in this matter have been cancelled, it goes on to provide that FINRA offers **virtual hearing services** (via Zoom and teleconference) to parties in all cases by joint agreement or by **panel order**."

b.  "**This Order documents and communicates the decision by the Arbitration Panel in this case to conduct virtual evidentiary hearings on the hearing dates agreed to by the parties in the prehearing teleconference call on May 7, 2020.** These **hearing dates** include **August 17-21 2020 and August 24-28 2020.**

Exhibit "B" hereto at p. 3 (bold in original).

17.     The Panel also set a July 27, 2020 teleconference with the parties to discuss the logistics of the scheduled hearing. *Id*. at p. 2

18.     During that July 27, 2020 teleconference, counsel for Legaspy objected to a Zoom virtual hearing arguing, *inter alia*, that the complexity of the issues, the large numbers of witness, and hundreds of exhibits together with the need for a translator made a Zoom hearing unworkable. Legaspy's attorneys further argued that there was no authority for the Panel to insist on a Zoom virtual hearing and that such s hearing would deprive Legaspy of an opportunity to present an effective defense.

19.     Given the number of witnesses and exhibits, that three sets of attorneys conducting examinations, and that the Claimants required an interpreter throughout the proceedings, *the Panel, while admitting that hearing would not be concluded in the time allotted and would need to be continued to sometime after February 2021*, nonetheless insisted that the hearing commence on August 17, 2020.

20. Pursuant to FINRA Arb. Rule 12514, the parties then exchanged witness and exhibit lists. Claimants listed thirteen (13) witnesses not including the Claimants. Pershing listed (8) witnesses not including Claimants, including *six (6) expert witnesses*. Legaspy and Insight listed eight (8) witnesses including two expert witnesses.

21. Thereafter, counsel for Legaspy and Insight sent the Arbitration Panel a letter, a copy of which is attached as Exhibit "B" hereto) objecting to the Zoom hearing and to preserve Legaspy and Insight's objection to the Zoom hearing.

### COUNT I
### (BREACH OF CONTRACT)

22. Plaintiff realleges ¶¶ 1-5 and ¶¶ 13-21above as this, ¶ 22 of Count I, as though fully set forth herein.

23. FINRA's Code of Arbitration is the arbitration agreement between FINRA and Legaspy. New York Bay Capital, LLC v. Cobalt Holdings, Inc., No. 1:19-CV-3618-GHW, 2020 WL 1989485, at *4 (S.D.N.Y. Apr. 27, 2020). Courts interpret the Code in accordance with principles of contract law. Bensadoun v. Jobe–Riat, 316 F.3d 171, 176 (2d Cir. 2003).

24. Parties are entitled to "attend all hearings" under the Code of Arbitration. FINRA Rule 2602(a).

25. The Code so states when telephonic appearance is permitted. The initial pre-hearing conference, for example, will "generally be held by telephone." *See* FINRA Rule 12500. Expungements require a hearing session, but the Code specifies that those sessions may proceed "by telephone or in person." *See* FINRA Rule 12805. The Code does not state that telephonic or virtual appearance are available for the full evidentiary hearing.

26. FINRA Arb. Rule 12213(a) states:
(1) The Director will decide which of FINRA's hearing locations will be *the hearing location* for the arbitration. Generally, the Director will select *the hearing location*

*closest to the customer's residence at the time of the events giving rise to the dispute, unless the hearing location closest to the customer's residence is in a different state,* in which case the customer may request a *hearing location in the customer's state of residence* at the time of the events giving rise to the dispute.

(2) Before arbitrator lists are sent to the parties under Rule 12402(c) or Rule 12403(b), the parties may agree in writing to a hearing l*ocation* other than the one selected by the Director.

(3) The Director may change the hearing l*ocation* upon motion of a party, as set forth in Rule 12503.

(4) After the panel is appointed, the panel may decide a motion relating to changing the hearing *location*.

Emphasis supplied.

27.    The remainder of FINRA Arb. Rule 12213 also speaks in terms of a change in *location of the hearing*: (a) by agreement of the parties prior to the appointment of the arbitrators (12213(a)(2)); (b) by the Director of Arbitrator by motion of a party (12213(a)(3)); the Arbitration Panel upon motion of a party (12213(a)(4)).   Nowhere, in FINRA Arb. Rule 12213 does not empower the Arbitration Panel (or for that matter, the Director of Arbitration) authority *to change the nature of the hearing*.

28.    The language of FINRA Arb. Rule 12213(a) is clear and unambiguous: the hearing will be conducted in a physical location.  *Nowhere, in FINRA's Code of Arbitration, is there any mention of, or authority for, a virtual hearing*. Since the Director of Arbitration selected Boca Raton, Florida as the location of the hearing in the Arbitration (*see* Exhibit "B" hereto at p. 3).

29.    Pursuant to FINRA Arb. Rule 12213(a), FINRA required Legaspy to execute a uniform submission agreement. *See* Exhibit "C" hereto at p. 2. That uniform submission agreement contains the following provision:

3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and *place* as may be designated by the Director of FINRA Office of Dispute Resolution or the arbitrator(s). The parties further agree and understand that conducted in accordance with the FINRA Code of Arbitration Procedure.

Exhibit "D" hereto at ¶ 3 (emphasis supplied).

7

3 0 .    Legaspy is entitled pursuant to FINRA's Code of Arbitration Procedure to an in-person hearing in that location.

3 1 .    By changing the nature of the hearing from the in-person hearing specified in FINRA Arb. Rule 12213 and the uniform submission agreement, the FINRA Arbitration Panel has violated the arbitration agreement between FINRA and Legaspy and has exceeded their authority within the meaning of 9 U.S.C. § 10(a)(4).

## COUNT II

## VIOLATION OF LEGASPY'S DUE PROCESS RIGHTS

3 2 .    Plaintiff realleges ¶¶ 1-21and ¶¶ 23-31 above as ¶ 32 of this, of Count II, as though fully set forth herein.

3 3 .    As set forth above, FINRA is acting as an agent of the S.E.C., an agency of the federal government in presiding over the Arbitration.

3 4 .    Legaspy is, pursuant to Fifth Amendment of the Constitution of the United States to due process of law, including, but not limited to, the right to present an effective defense.

3 5 .    By acting without authority to force Legaspy to participate in a Zoom hearing in violation of FINRA's Code of Arbitration and beyond the scope of the authority granted them by that code, FINRA has violated Legaspy's right to due process.

## COUNT III

## INJUNCTIVE RELIEF

3 6 .    Plaintiff realleges ¶¶ 1 thru 33 above as ¶ 34 of this, Count III, as though fully set forth above.

3 7 .    Respondents in FINRA arbitrations have a right to due process protections of "(1) notice, and (2) an opportunity to present relevant evidence and arguments" to protect themselves

in an arbitration. <u>Ebbe v. Concorde Inv. Servs., LLC</u>, 392 F. Supp. 3d 228, 236 (D. Mass. 2019), *aff'd on other grounds*, 953 F.3d 172 (1st Cir. 2020).

3 8 .    Unless enjoined from proceeding with the virtual Zoom hearing, Legaspy will suffered immediate and irreparable harm.

3 9 .    Legaspy and Insight are covered by a $1 million errors and omissions policy ("the policy") that, after an initial $100,000 deductible, is eroded by attorney's fees and costs.

4 0 .    Insight is required by regulators to maintain a minimum of $100,000 in net capital to continue operating.

4 1 .    Insight has net capital of approximately $500,000.  Therefore, if an award is entered in excess of the $400,000 plus whatever remains of the policy entered against Insight, the firm, will be forced to cease business. As a result, Legaspy will lose his access to his customer accounts and will be unable to pursue his business.

4 2 .    The fact that Insight and Legaspy have a right, to vacate an adverse award pursuant to 9 U.S.C. § 10(a)(4) is unavailing since the moment such an award is entered Insight will be deemed undercapitalized by FINRA, rendering any right to appeal such an adverse award meaningless.

4 3 .    Moreover, since the policy limits are eroded by attorney's fees, forcing Legaspy to participate in a meaningless hearing would irrevocably reduce the insurance coverage available to him and Insight. Thus, Legaspy has no adequate remedy at law.

4 4 .    The burden of imposing the requested injunctive relief is, on the other hand, negligible, if at all. The Arbitration Panel has already conceded that the hearing will need to be continued to sometime in 2021.

4 5 .    FINRA has administratively adjourned all hearings, except Mr. Legaspy's, to

October 2, 2020 and the Arbitration is, on information and belief, the only FINRA arbitration that has been ordered to proceed virtually over the objection of a party.

46.    There is no reason, whatsoever, to force Legaspy to participate in an unauthorized virtual hearing where he cannot effectively defend himself only to have the remainder of the hearing continued to some, as yet undetermined time, in 2021.

WHEREFORE, Plaintiff prays that this Court enter an order enjoining FINRA from conducting a virtual hearing in FINRA Arb. No. 19-00474.

Respectfully Submitted

Nicholas P. Iavarone, Esq.

The Iavarone Firm, P.C.
2516 Waukegan Road, #399
Glenview, IL 60025
(312) 637-9466
(800) 417-0580 (fax)
niavarone@iavaronefirm.com

# Exhibit "A"



**TO:**  Darryl J. Bouganim, Esq.
Jeffrey J. Chapman, Esq.
Sean G. Rohan, Esq.
Mary Burns
Edmund Donovan
Jack Friedman

**From:**  Arthur Baumgartner
Senior Case Administrator

**Subject:**  FINRA Dispute Resolution Services Arbitration Number 19-00474
Alberto Jose Nieves and Gladys Veronica Anton vs. Carlos Legaspy, Insight
Securities, Inc., and Pershing, LLC

**Date:**  June 23, 2020

In response to the evolving coronavirus disease 2019 (COVID-19), **FINRA has decided to administratively postpone all in-person arbitration and mediation proceedings scheduled through September 4, 2020**. As a result, the hearings in this matter have been postponed. Please note that this decision does not affect other case deadlines. All case deadlines will continue to apply and must be timely met unless the parties jointly agree otherwise.

FINRA Dispute Resolution offers virtual hearing services (via Zoom and teleconference) to parties in all cases by joint agreement or by panel order. These services provide high-quality, secure, user-friendly options for conducting video and telephonic hearings and sharing documents remotely. Staff is available to schedule virtual hearings and provide technical support. Parties that are interested in exploring this option are encouraged to contact their Case Administrator for details.

In order to expedite rescheduling, FINRA will convert the first day of the cancelled hearing, August 17, 2020 at 9:00 AM Eastern Time into a telephonic pre-hearing call to discuss the schedule for the case going forward. Any joint requests by the parties to change the date of this pre-hearing conference or to keep the hearing dates and proceed telephonically or by video conference should be submitted **by close of business on July 6, 2020**. Such joint requests will be submitted to the panel for their determination.

We recognize that this decision may cause inconvenience and we do not make it lightly. We are taking this preventative action out of an abundance of caution, in the interest of public safety. The well-being of our FINRA employees, arbitrators, stakeholders and communities is of paramount importance.

If you have any questions, please do not hesitate to contact me at 212-858-4724 or by email at NEProcessingCenter@finra.org.

Investor protection. Market integrity.

Office of Dispute Resolution
Northeast Regional Office

One Liberty Plaza
165 Broadway
27th Floor
New York, NY
10006-1404

t  212 858 4200
www.finra.org

AB1:nsc:LC53A
idr: 02/18/2020

RECIPIENTS:
Darryl J. Bouganim, Esq., Malecki Law, 11 Broadway, Suite 715, New York, NY 10004
On Behalf Of: Gladys Veronica Anton; Alberto Jose Nieves

Jeffrey J. Chapman, Esq., McGuire Woods LLP, 1251 Avenue of the Americas, 20th Floor, New York, NY 10020-1104
On Behalf Of: Pershing LLC

Sean G. Rohan, Esq., O'Hangan Meyer, LLC, One East Wacker Drive, Suite 3400, Chicago, IL 60601
On Behalf Of: Insight Securities, Inc.; Carlos Javier Legaspy

Mary Burns
Edmund Donovan
Jack Friedman

# Exhibit "B"

©2020 FINRA. All rights reserved.

# ORDER

**Submitted By:** Edmund Donovan (On behalf of the arbitration panel)
**Submitted Date:** 06/25/2020 01:59:29 PM EST

**Case ID & Parties:**
**_FINRA Dispute Resolution Services_**
ORDER

**Case Number:** 19-00474

**In the Matter of the Arbitration Between**

| Claimant(s) | VS | Respondent(s) |
|---|---|---|
| Alberto J Nieves | | Pershing LLC |
| Gladys V Anton | | Carlos J Legaspy |
| | | Insight Securities, Inc. |

## PREHEARING CONFERENCE

1. Was a prehearing telephonic conference held in the above captioned matter?
   ○ Yes
   ● **No**

## ISSUES ADDRESSED

2. Issues addressed: (i.e., name of motion or request, by which party)
   ● **The following pleadings have been addressed:**

   > **_This Order documents and communicates the decision by the Arbitration Panel in this case to conduct virtual evidentiary hearings on the hearing dates agreed to by the parties in the prehearing teleconference call on May 7, 2020. These hearing dates include August 17-21 2020 and August 24-28 2020._**

## ORDER DECIDED BY

3. Decided by:
   ○ Chairperson
   ● **Panel**

## RULINGS

4. Rulings:
   ● **After considering the pleadings submitted by the parties (and oral arguments, if prehearing conference held), the Panel/Chairperson rules as follows:**

> ***It is hereby Ordered that the scheduled hearing dates for this case (August 17-21 2020 and August 24-28 2020)are not cancelled and FINRA's virtual hearing services will be used to conduct this arbitration.***

5. Order compliance date:
- ○ The parties should comply with this order by _____
- ● **Not applicable**

## ASSESSMENT OF FEES

6. Cost of prehearing conference:
- ○ If the parties settle this matter with no further hearings, the forum fees for this prehearing conference (or discovery-related motion decided without a prehearing conference) are assessed as follows:

    _____% to Claimant(s), jointly and severally

    _____% to Respondent(s), jointly and severally

    _____% assessed to _____

    _____% assessed to _____

    _____% assessed to _____

    _____% assessed to _____
- ● **Not applicable**

## ATTACHMENTS

| Attachment Type | File Name | Description |
|---|---|---|
| Other | FINRA ORDER No 6 in Nieves case (19-00474) 06.25.2020 signed.pdf | ORDER No. 6 in case 19-00474 signed |



**Alberto Jose Nieves and Gladys Veronica Anton vs.**
**Carlos Legaspy, Insight Securities, Inc., and Pershing, LLC (No. 19-00474)**

## FINRA Arbitration Panel ORDER No. 6

This Order addresses the FINRA Memorandum dated June 23, 2020 from Arthur Baumgartner, Senior Case Administrator at FINRA, to the members of the Arbitration panel and the attorneys representing the parties in the above-referenced matter. This Memorandum notifies the recipients that FINRA has decided to administratively postpone all *in-person* arbitration and mediation proceedings scheduled through September 4, 2020. Although the Memorandum states that the hearings in this matter have been cancelled, it goes on to provide that FINRA offers **virtual hearing services** (via Zoom and teleconference) to parties in all cases by joint agreement or by **panel order**.

**This Order documents and communicates the decision by the Arbitration Panel in this case to conduct virtual evidentiary hearings on the hearing dates agreed to by the parties in the prehearing teleconference call on May 7, 2020.** These **hearing dates** include **August 17-21 2020** and **August 24-28 2020**. The specific protocols and procedures that will be followed when conducting the virtual hearings on these dates will be discussed and decided on during the prehearing teleconference call that is currently scheduled for July 17, 2020 at 9am. The parties' attorneys participating in this call on July 17, 2020 should come prepared to discuss how they will make any documents they plan to use during the virtually hearings available to opposing counsel and the Panel members and when their witnesses will be available and scheduled for testimony on these hearing dates.

<span style="color:red">**It is hereby Ordered that the scheduled hearing dates for this case are not cancelled and FINRA's virtual hearing services will be used to conduct this arbitration.**</span>

The Panel's intention is to resolve the parties' disputes on the merits fairly, equitably and as quickly as possible.

June 25, 2020

*Mary Ellen Burns*

_____
Arbitrator – Mary Ellen Burns

*Edmund T. Donovan*

_____
Arbitrator – Edmund T. Donovan


_____/signed/_____
Arbitrator – Jack Friedman

1

# Exhibit "C"



**Sean G. Rohan**

312.422.6100 OFFICE
312.422.6142 DIRECT
312.422.6110 FAX
srohan@ohaganmeyer.com

July 31, 2020

<u>**VIA EMAIL & DR Portal**</u>
Arthur Baumgartner
FINRA Dispute Resolution
One Liberty Plaza
165 Broadway, 27th Floor
New York, NY 10006

  **Re:** **No. 19-00474 –** *Alberto Jose Nieves et al. vs. Legaspy et al. ("Nieves")*
     **Preservation of Rights Letter**

Mr. Baumgartner:

  Insight Securities, Inc., ("<u>Insight</u>") and Carlos J. Legaspy ("<u>Legaspy</u>"), collectively ("<u>Respondents</u>") write to clarify an important position ahead of our upcoming arbitration commencing on August 17, 2020. By this point, the Panel is likely aware that Insight and Mr. Legaspy object to moving forward with arbitration by Zoom this coming month. The purpose of the letter is to clarify for the Panel the reasons why, not to ask to adjourn the hearing, though Respondents view that as the most prudent course.

  First, FINRA administratively adjourned this arbitration due to challenges posed by the ongoing COVID-19 pandemic. The pandemic has not resolved. Indeed, it has intensified in the preceding weeks.

  Second, the parties in this case never agreed to proceed remotely. Neither the arbitration clause nor the FINRA Code of Arbitration Procedure requires virtual evidentiary hearings. There is no mention of videoconferencing or virtual hearings in FINRA Rule 12600. Likewise, the FINRA Code specifically authorizes panels to conduct prehearing conferences and certain types of hearings "telephonic[ally]" or "by telephone" (*see, e.g.,* FINRA Rules 12206, 12504, 12500, and 12805) – but nowhere does the FINRA Code specifically authorize teleconferences for the final evidentiary hearing. This interpretation alone would give the losing party legitimate grounds to have the final award vacated.

  While FINRA's recent guidance on Zoom has not offered guidance for when virtual hearing may be appropriate (assuming it is even allowed at all), FINRA's recent "Arbitrator Resource Guide for Virtual Hearings" does make the critical point that a virtual hearing should not proceed if it would be ***"unfair" to any party: "The Panel must postpone the virtual hearing until further notice if the Panel believes the virtual hearing will result in unfairness to any party."*** FINRA Resource Guide at p. 2 (emphasis added). **Ex. 1**. Forcing a party to choose between

July 31, 2020
PAGE - 2 –

adequate hearing preparation/support and the health and safety of its counsel is unfair and FINRA dictates that a virtual hearing here should not take place.

Third, this case is too complex to be heard at this early date, particularly via remote means. Respondents in FINRA arbitration still have a right to due process protections of "(1) notice, and (2) an opportunity to present relevant evidence and arguments" to protect themselves in an arbitration. *Ebbe v. Concorde Inv. Servs., LLC*, 392 F. Supp. 3d 228, 236 (D. Mass. 2019), aff'd on other grounds, 953 F.3d 172 (1st Cir. 2020). Respondents are deeply concerned as to their ability to defend themselves. Numerous witnesses, uncertainty as to platform (Zoom, Citrix, other), sheer number of documents and exhibits, and frustrating technical problems will make the evidence impossible to follow.

For similar reasons of fairness, courts across the country and arbitrators have opted not to conduct trials and evidentiary hearings through Zoom but instead to postpone until the pandemic passes. Indeed, virtual hearings are far from being the "new norm" or the default in any arena, let alone the international arbitration arena. In fact, just the opposite is true. The arbitration forum operated by the International Chamber of Commerce ("ICC"), the largest business organization in the world, has long recognized that its arbitrators generally err on the side of caution and require face-to-face hearings – as opposed to a videoconference hearing – if requested by a party:

> As a manifestation of basic due process rights, [ICC Rule of Arbitration] Article 25(2) gives any party the right to request a hearing. … [W]hether the arbitral tribunal construes Article 25(2) as requiring a face-to-face hearing, or whether the use of video or teleconferencing suffices, *will depend on the circumstances of the case.* In practice, *arbitral tribunals have generally erred on the side of caution* and interpreted Article 25(2) as *requiring at least one face-to-face hearing on the merits if a party insists*.

The Secretariat's Guide to ICC Arbitration (2012 ed.), at ¶ 3-958 (emphasis added).

Fourth, vacatur risk is real given the impossibility—for all parties—of presenting clear evidence and making a clean record. Vacating the award only delays a final merits resolution and requires two arbitrations, which no one wants. And such vacatur is a reality as courts across the United States are still rejecting the notion of a virtual evidentiary trial and opting instead to change the dates in the hope that the pandemic passes. As Law360 has reported over the last few weeks:

> A California federal judge postponed a criminal jury trial from October 2020 until the first quarter of 2021 due to the pandemic, given the "the length of the trial," "the roughly 170 witnesses" to be called, and the defendant's opposition to a virtual trial. Law360, *Theranos Judge Says Ex-CEO's Oct. Trial Date Is 'Unrealistic'* (July 20, 2020), attached as **Ex. 2**.

> A New York federal judge postponed a criminal jury trial from September 2020 until at least December 2020 after the government argued that "with the resurgence of the coronavirus pandemic and associated restrictions, it would be difficult to prepare for

July 31, 2020

PAGE - 3 –

a document-intensive case such as this one without having in-person meetings with witnesses." Law360, *SDNY Trial of Banker Tied to Manafort Is Delayed* (July 2, 2020), attached as **Ex. 3**.

A Delaware federal judge postponed a civil trial from August 2020 until a date to be determined, after a party argued that "[p]resenting all witnesses by video, and limiting the number of counsel who can appear live, might substantially impact the trial presentation," and "[m]any courts acknowledge that remote testimony impairs a factfinder's ability to judge credibility." Law360, *Del. Judge Postpones Aug. Patent Trial After Cox's Virus Plea* (July 15, 2020), attached as **Ex. 4** (internal quotes omitted).

Delaware's chief federal judge postponed a civil jury trial from August 2020 until a date to be determined, after a party argued that the partially virtual trial would "jeopardize norms favoring in-person testimony," and that "it was concerned about the substantial economic and personal costs to its attorneys, who the judge asked to self- quarantine for 14 days before the trial upon arriving [in] Delaware from their home in Houston, Texas." Law360, *Sunoco Patent Trial 'Experiment' Nixed After Virus Objections* (July 13, 2020), attached as **Ex. 5** (internal quotes omitted).

The Delaware Chancery postponed a 10-day trial from July 2020 until March 2021 due to the pandemic, given concerns about interstate travel and the necessity of at least "partial live, in-court proceedings." Law360, *COVID-19 Delays Musk Chancery Trial to March 2021* (July 16, 2020), attached as **Ex. 6**.

A Massachusetts federal judge postponed a criminal jury trial from September 2020 until at least January 2021, stating: "The trial date previously established is not one that is realistic in light of the pandemic and the continuing state of emergency." Law360, *Mass. Mayor's Cannabis Extortion Trial Delayed Until 2021* (July 16, 2020), attached as **Ex. 7** (internal quotes omitted).

Even the preeminent claimants' bar in FINRA arbitrations – the Public Investors Advocate Bar Association ("PIABA") – has taken the position that "virtual hearings … cannot become the default or only option for parties," as some parties "believe it to be an inadequate means of addressing their grievances" (*e.g.*, because the inability to subject witnesses to the scrutiny of an in-person hearing may be "inconsistent with traditional notions of justice in our adversarial system."). PIABA Letter to FINRA (July 16, 2020), attached as **Ex. 8**, at p. 2. In its recent letter to FINRA, PIABA asserted that "FINRA should resume in-person hearings—in compliance with applicable health and safety guidelines—beginning on September 14, 2020." *Id.* at p. 1. In addition to the point above that virtual hearings may be "inadequate," PIABA argued that: (1) "FINRA can safely hold in-person hearings by complying with relevant health and safety guidelines"; and (2) "FINRA's current approach to the pandemic is out-of-step with competing dispute resolution forums" (*e.g.*, "JAMS has resumed in-person hearings in major metropolitan areas such [as] Chicago, Washington, D.C., and Boston by taking precaution in accordance with CDC guidelines"). *Id.* at pp. 1-2.

July 31, 2020
PAGE - 4 –

       To be clear, Respondents will participate with their best efforts in the upcoming hearing solely to avoid a default. A default could adversely impact Insight's net capitalization and potentially put it out of business. Insight's presence is not, and should not be viewed as, a waiver of its right to a fair hearing when folding the company and compromising its clients' portfolios is the alternative.

       Insight writes only to clarify its prior requests for an adjournment to a time when a hearing can safely proceed in one sitting with the parties, Panel, attorneys, and key participants convened to present this complex, multi-lingual case.

                   Very Truly Yours,

                   Sean G. Rohan
                   O'Hagan Meyer, LLC

cc: All Counsel of Record

# EXHIBIT 1

# FINRA Dispute Resolution Services Arbitrator Resource Guide for Virtual Hearings

## Table of Contents

Introduction ..................................................................................................................................... 2

Getting Started ................................................................................................................................. 2

    What You Need .............................................................................................................................. 2

Additional Considerations for Virtual Hearings ............................................................................. 2

    Fairness and Impartiality ............................................................................................................. 2

    Confidentiality and Security ........................................................................................................ 2

    Technology Challenges ................................................................................................................ 3

Preparing for the Virtual Hearing ................................................................................................... 3

    Note to the Chairperson .............................................................................................................. 3

Commencing the Virtual Hearing .................................................................................................... 4

    Chairperson's Opening ................................................................................................................ 4

Recording the Virtual Hearing ........................................................................................................ 5

During the Virtual Hearing .............................................................................................................. 5

    Participant Etiquette ................................................................................................................... 5

    Breaks .......................................................................................................................................... 5

    Host Responsibilities ................................................................................................................... 5

    Witnesses .................................................................................................................................... 5

    Technical Support ........................................................................................................................ 6

Effective Practices ........................................................................................................................... 6

    Location and Background ............................................................................................................. 6

    Audio Considerations .................................................................................................................. 6

    Minimize Distractions ................................................................................................................. 6

    Dress and Etiquette ..................................................................................................................... 6

FINRA's Security Considerations ..................................................................................................... 7

Technical Support and Resources ................................................................................................... 7

Disclaimers ...................................................................................................................................... 7

## Introduction

The coronavirus disease 2019 (COVID 19) has increased the demand for effective virtual hearings to ensure that arbitration and mediation cases proceed without lengthy delays. Upon request of the parties or order of the Panel, FINRA Dispute Resolution Services is providing videoconferencing through the Zoom platform, accessible via finra.zoom.us.

FINRA Dispute Resolution Services is providing this Resource Guide to help arbitrators conduct effective virtual arbitration hearings via the Zoom platform.

## Getting Started

### What You Need

1. A PC, laptop or large tablet (with built-in camera and microphone):
    a. If available, a large screen is better, particularly for hearings with many participants.
    b. If a PC, laptop or large tablet is unavailable, a smart phone may be used in some circumstances (noting that the screen is smaller and not optimal).
2. Notepad and pen as the screen you are using to participate in the virtual hearing may not be available for other purposes, such as taking notes or viewing documents through the DR Portal.
3. A high-speed internet connection. If available, a hard-wired internet connection is preferable to a wireless internet connection.
4. A quiet, private location and neutral background. See **Effective Practices** for more information.
5. If available:
    a. Dual monitors (or a single monitor and a laptop screen). This allows the virtual hearing to appear on one screen, while the other can be used for other purposes, such as viewing documents through the DR Portal or taking notes.
    b. A good quality webcam.

## Additional Considerations for Virtual Hearings

Additional considerations that the Panel should be aware of when proceeding with virtual hearings include:

### Fairness and Impartiality

1. The platform must allow parties to present evidence and testimony, including direct and cross-examination of witnesses.
2. All persons in each videoconferencing location must be permitted to participate in the hearing and be clearly identified before the virtual hearing begins. See **Witnesses** for more information.
3. Any relevant documents must be clearly identified, disclosed and provided to the Panel.
4. The Panel must postpone the virtual hearing until further notice if the Panel believes the virtual hearing will result in unfairness to any party.

### Confidentiality and Security

FINRA has taken additional measures related to the security of virtual hearings held via Zoom. See **FINRA's Security Considerations** for more information.

In addition to FINRA's security measures, the Panel should:

2

1. Require that only the parties, party representatives, witnesses and other relevant individuals to the proceeding be permitted to participate in the virtual hearing.
2. Discourage the use of virtual backgrounds so that the Panel can clearly see the videoconference location and ensure that there are no unauthorized attendees.
3. Prohibit the recording of the virtual hearing (other than the official FINRA recording by the Host).

## Technology Challenges

The seamless running of technology is vital to the success of a virtual hearing. Power outages and internet disconnections can limit the effectiveness of the videoconferencing platform. Accordingly, the Panel should have contingencies in place in the event the primary platform fails or otherwise becomes impractical to use. For example, if disconnected, a participant may dial-in to the hearing by telephone so that the parties and panel can discuss whether the hearing can proceed or should be postponed.

# Preparing for the Virtual Hearing

FINRA Dispute Resolution Services provides training to neutrals on using Zoom and videoconferencing effective practices. See **Effective Practices** for more information.

Prior to a virtual hearing, FINRA Dispute Resolution Services will set up a Zoom "trial run" with the Panel to test the Panel's equipment, familiarize the Panel with the Zoom platform and ensure that the Panel understands the following functions:

- Overall Display
- Control Panel
- Participant List
- Muting/Unmuting
- Share Screen
- Passing Control
- Inviting a Participant
- Waiting Room/Breakout Rooms
- Locking the Hearing

During the "trial run," FINRA Dispute Resolution Services will:

1. Troubleshoot and assist to resolve any technical issues with the Panel's equipment.
2. Check the arbitrators' background and lighting conditions to ensure that they are appropriate for the virtual proceeding.
3. Discuss the responsibilities for hosting/co-hosting and recording.

Upon request, FINRA Dispute Resolution Services can also set up a Zoom "trial run" with the parties or party representatives. Note, however, that each party is responsible for setting up a "trial run" for its witnesses in advance of the virtual hearing.

## Note to the Chairperson

Prior to the virtual hearing, the Chairperson may want to request that the parties provide a Virtual Hearing Participant List so that, on the day of the hearing, the Chairperson can ensure that only authorized individuals are admitted into the videoconference. The Virtual Hearing Participant List would

provide the name, email address and phone number for each participant and would be submitted in addition to the witness list (which is required under Rules 12514(b)/13514(b) of the Codes of Arbitration Procedure ("Codes")).

## Commencing the Virtual Hearing

1. Prior to the commencement of the hearing:
   a. The Panel should arrive 15-30 minutes early to set up.
   b. The FINRA Case Administrator will be the Host for the meeting, unless the Panel designates an arbitrator as the Host (see paragraph (c) below). The Host has access to additional functions such as recording, and managing participants, the breakout rooms and the waiting room.
   c. If an arbitrator is comfortable with running the virtual hearing and wishes to do so, the Panel may designate that arbitrator as the Host. The Host function can only be retained by a FINRA Case Administrator or an arbitrator.
2. If an arbitrator chooses to retain the Host function, the FINRA Case Administrator will continue to be available during the virtual hearing for ongoing technical support. See **Technical Support** for more information.
3. At the commencement of the virtual hearing:
   a. The Host will verify the participants as they are admitted into the videoconference and, as necessary, will set up breakout rooms (e.g. for executive sessions and for each represented party).
   b. Once all participants have joined, the meeting will be locked to prevent any additional attendees from joining.
   c. The Host will start the recording.

## Chairperson's Opening

The Chairperson should add the following to his or her opening remarks:

1. Ask each participant to affirm that:
   a. No unauthorized individuals are present in each participant's videoconferencing location. The Chairperson may require participants to scan their videoconference locations with the camera to show that there are no unauthorized individuals in the room.
   b. No one will record this virtual hearing (or any part of it) other than the official FINRA recording (per Rules 12606/13606 of the Codes), as controlled by the Host.
2. Advise that participants can share documents (e.g. exhibits) using the Share Screen feature, but that all documents must still be provided to the Panel.
3. Advise the panel and parties to avoid sharing personal confidential information, unless such sharing is necessary for the proceedings.
4. Create a back-up plan if a participant's power or internet is disconnected. For example, if unable to get back into the videoconference, the participant can call or email the FINRA Case Administrator so that the Panel can be advised and a plan to resume the hearing can be made.

4

# Recording the Virtual Hearing

FINRA records evidentiary and expungement virtual hearings in accordance with Rules 12606/13606 of the Codes. While both the audio and video of the virtual hearing is recorded, FINRA retains only the audio recording for the case file. Accordingly, the audio recording is the official FINRA recording under Rules 12606/13606 of the Codes. FINRA retains the recording of any evidentiary and expungement virtual hearings in accordance with FINRA's record retention obligations.

Upon the commencement of the evidentiary or expungement virtual hearing, the Host will:

1. Start the recording.
2. Clearly announce that the hearing is being recorded.

As with physical recorders, the Host should pause or stop the recording for breaks and remember to re-start the recording upon return to session.

# During the Virtual Hearing

## Participant Etiquette

For the early part of the hearing, the Panel should ask that participants state their names before speaking so other participants can easily identify the speaker.

## Breaks

Virtual hearings can be tiring. The Panel may want to consider allowing two shorter breaks in the morning and two shorter breaks in the afternoon.

## Host Responsibilities

During the virtual hearing, the Host should:

1. Keep the participant list open and watch for participants who may be disconnected from the videoconference.
2. Monitor the waiting room.
3. Manage the virtual hearing by utilizing some of the following key features:
   a. **Share Screen** – allows the Panel and parties to share documents (e.g. exhibits). Participants can also annotate documents if required (particularly helpful for witnesses).
   b. **Breakout rooms** - for executive sessions with the Panel or to allow party representatives to convene with their clients.
4. Be aware of anyone who may need to join (e.g. witnesses) so that the videoconference can be unlocked to allow them access.

## Witnesses

1. The Panel should advise party representatives to call their witnesses prior to the time that they need to testify so that they can be joined to the videoconference. The Host will need to unlock the videoconference to allow the witness entry.
2. The Panel may want to ask the witness to pan the room with the camera to show that no one else is present in the room.

## Technical Support

The FINRA Case Administrator will be available during the virtual hearing to:

1. Control entry of the participants to the proceeding.
2. Facilitate the use of breakout rooms where required.
3. Troubleshoot any technical issues.

FINRA Dispute Resolution Services has trained staff to utilize the Zoom videoconferencing platform and has purchased Zoom Pro licenses for use in virtual hearings.

# Effective Practices

The Panel should keep in mind the following effective practices for a successful virtual hearing:

## Location and Background

1. Ensure your location is well-lit. Backlighting is not desirable.
2. Ensure that you have a neutral background to minimize distractions.

## Audio Considerations

1. Ensure your location is quiet.
2. Mute your microphone when not speaking. This will avoid any background noise like construction, lawnmowers, barking dogs, televisions, etc. Be sure to turn your microphone back on before speaking.
3. If not muted, take notes quietly. If necessary, use pen and paper as opposed to using a keyboard.
4. Mute all other devices (e.g. cellphones/iPads).

## Minimize Distractions

1. Position your camera at eye level. When a camera is angled too high or too low, it can be distracting. Also, ensure your computer is on a flat surface.
2. Turn off any pop-up computer notifications (e.g. emails) to prevent these from distracting you during the virtual hearing. This will also prevent notifications from appearing in the event you use the Share Screen function.
3. Close all windows other than Zoom, the DR Portal and any case-related documents – this helps with bandwidth and minimizes confusion/distraction.
4. Avoid multitasking. Do not check your cell phone or emails during the hearing.

## Dress and Etiquette

1. Always look professional and dress as if you are meeting in-person.
2. Do not turn off your video and always remain visible on camera to the parties during the virtual hearing. Don't walk around while on camera. If you need to leave the room, please announce it as you would if you were in-person.
3. Be conscious of your body language. Despite being on videoconference, the parties are still watching your engagement.
4. Do not eat during the virtual hearing. Ensure that enough breaks are provided accordingly.

## FINRA's Security Considerations

FINRA implements the following security measures for all arbitrations and mediations conducted by Zoom:

- A unique, randomly-generated meeting ID;
- A unique, randomly-generated meeting password to be admitted to the meeting; and
- Use of the "waiting room feature" to ensure that only invited participants are admitted to the meeting.

In addition, FINRA-administered meetings are restricted to Zoom's US data centers.

For additional information on how Zoom maintains the security of its service, visit Zoom's Privacy and Security Page or consult Zoom's Best Practices for Securing Your Zoom Meetings or Zoom's Security Whitepaper.

## Technical Support and Resources

If you have further questions, you can contact your FINRA Case Administrator.

In addition, Zoom has some resources you may find helpful:

- For technical documentation or quick start videos: Visit the Zoom Help Center
- For free and interactive live training webinars on important topics hosted by Zoom experts: View Live Trainings & Recordings

There are a number of topic-specific tutorials on Zoom's website; the following are recommended for virtual hearings:

**Zoom Meetings and Webinars**

- Join a Meeting
- Meeting Controls
- Breakout Rooms
- Closed Captioning

**Audio, Video and Sharing**

- Recording a Zoom Meeting
- Joining and Configuring Audio and Video
- Sharing Your Screen

## Disclaimers

FINRA notes that virtual hearings are conducted through Zoom, which is a third party platform. The use of this platform for virtual hearings is subject to Zoom's terms and policies, for example: https://zoom.us/privacy-and-legal. FINRA arranges virtual hearings through Zoom for the Panel's and parties' convenience. FINRA does not endorse any one platform over another nor does FINRA guarantee the suitability or availability of any platform. Any concerns regarding the use of a third party videoconferencing platform should be raised by copying correspondence to all parties in the case.

# EXHIBIT 2

Case: 1:20-cv-04700 Document #: 1 Filed: 08/11/20 Page 32 of 62 PageID #:32



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Theranos Judge Says Ex-CEO's Oct. Trial Date Is 'Unrealistic'

By **Dorothy Atkins**

Law360 (July 20, 2020, 8:04 PM EDT) -- A California federal judge said Monday that former Theranos CEO Elizabeth Holmes' upcoming October criminal jury trial date is "unrealistic" in light of challenges posed by the coronavirus pandemic, but he held off on setting a new trial date.

During a hearing held via Zoom, U.S. District Judge Edward Davila said the October trial date is "just not going to happen," but he's "hopeful" to get the case tried in the first quarter of 2021. However, he refused to officially scrap the October trial date outright, explaining that he wants the parties to stay on pace to get their pretrial motions filed and litigated so they're ready for trial.

The judge's comments came during a hearing on multiple motions that are pending in criminal cases against Holmes and Theranos' former chief operating officer Ramesh "Sunny" Balwani. The pair face charges of defrauding investors and uninsured patients by making false claims about the capabilities of their once high-flying startup's blood testing technology.

After **the indictment** was filed in 2018, Judge Davila this year **cut some charges** and **severed Holmes' trial** from Balwani's case. He set Holmes' trial **for August** and Balwani's for April 2021, but in the spring the judge pushed back Holmes' trial **to October** due to the pandemic.

On Monday, Holmes' counsel, Lance A. Wade of Williams & Connolly LLP, asked the judge to push her trial to April 2021, arguing that the length of the trial and amount of witnesses will pose unique challenges and health risks, and it wouldn't be safe to hold it in October.

Wade noted that the government has identified roughly 170 witnesses it plans to call, and many will have to travel from hot-spot states, including Arizona, Florida, Texas and Georgia, to testify. He also opposed holding the trial virtually and pointed out that at least some of it will have to take place in court.

Prosecutor Robert S. Leach said repeatedly that the government is prepared to go to trial in October, but he also said it would agree to push back the trial date to February 2021 at the latest. He added that there are only a handful of witnesses over the age of 65 who could testify via video deposition if necessary.

Judge Davila recognized the challenges posed by the coronavirus, and ordered the parties to meet and confer to come up with a potential new schedule.

Aside from discussing the trial schedule, the judge heard arguments on multiple motions, including one to dismiss the government's **information sheet** and another to exclude certain testimony from doctors who are expected to testify on their concerns about the accuracy of Theranos' devices.

Holmes' and Balwani's counsel generally argued that the government's allegations and evidentiary notices were too broad and must be more specific, but prosecutors argued that the defense teams are trying to hold the government to a heightened pleading standard as though this were a civil fraud case.

After hearing arguments on the motions, Judge Davila questioned whether the motions were either

Case: 1:20-cv-04700 Document #: 1 Filed: 08/11/20 Page 33 of 62 PageID #:33

premature or mooted by a superseding indictment that the government filed last week, particularly since the defendants said they plan to file a motion to dismiss the new indictment in part.

The judge said he wouldn't rule on the outstanding motions until after the parties meet and explain to the judge how the superseding indictment impacts the issues discussed in the motions. He added that he's "not inclined to grant" the motion to exclude the witness testimony.

As of Monday, the judge had not yet set the date for the next case management conference.

The government is represented by John C. Bostic, Jeffrey Schenk, Robert S. Leach and Vanessa Ann Baehr-Jones of the U.S. Attorney's Office for the Northern District of California.

Holmes is represented by Kevin Downey, Lance A. Wade, Patrick J. Looby, Amy Mason Saharia and Seema Mittal Roper of Williams & Connolly LLP, and John Cline.

Balwani is represented by Jeffrey B. Coopersmith, Steve Cazares and Amanda McDowell of Orrick Herrington & Sutcliffe LLP.

The case is U.S. v. Holmes et al., case number 5:18-cr-00258, in the U.S. District Court for the Northern District of California.

--Editing by Adam LoBelia.

All Content © 2003-2020, Portfolio Media, Inc.

# EXHIBIT 3



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# SDNY Trial Of Banker Tied To Manafort Is  Delayed

By **Stewart Bishop**

Law360 (July 2, 2020, 9:02 PM EDT) -- A New York federal judge on Thursday delayed at least until December the trial of a banker accused of attempting to bribe Trump campaign boss Paul Manafort with $16 million in loans in exchange for a shot at working in the administration.

During a morning conference held by video and telephone, U.S. District Judge Lorna G. Schofield postponed Stephen M. Calk's jury trial to Dec. 1 from its previously planned September date, but said the protocol for when trials will resume is still unsettled as a result of the continuing COVID-19 outbreak and that the date could change again.

Judge Schofield noted that when trials in the Southern District of New York begin again, priority will be given to criminal defendants who are currently jailed. Calk, founder and former CEO of Federal Savings Bank of Chicago, is free on a $5 million personal recognizance bond.

"I'll set a scheduling order but with the understanding that everyone take it with a grain of salt," Judge Schofield said.

The Southern District announced late Thursday that it would begin Phase 2 of reopening on Monday, meaning courthouses will allow members of the public who have official business before the court to enter, although jury trials are still off the table.

"We don't really know when jury trials will commence again. That is very much dependent on the health situation in New York," Judge Schofield said.

The judge said that while many steps are being taken to prepare SDNY courthouses for the reopening of jury trials, "we are not there yet."

Calk was charged in May 2019 with attempting to bribe Manafort, the now-incarcerated former head of Donald Trump's successful presidential campaign, with $16 million in loans to get a top administration post such as ambassador or secretary of the Army.

Calk's lawyers have said their client was an adviser to Trump's campaign and felt called to serve the new administration. The bank's loans to Manafort — who by then had been terminated by the Trump campaign — had nothing whatsoever to do with Calk's desire to serve, they say.

Judge Schofield said it was highly likely that when jury trials restart in SDNY, they will be limited to certrain courtrooms in Manhattan that can accommodate social distrancing among jurors.

"There will only be a limited number of jury trials that can proceed at the same time," she said.

An attorney for Calk, Paul H. Schoeman of Kramer Levin Naftalis & Frankel LLP, made clear that his client wished to go to trial as soon as possible, but deferred to Judge Schofield's judgment on the matter.

Schoeman at one point also noted amid talk about a discovery dispute that the government has put Manafort, former Trump campaign deputy chairman Rick Gates and Trump's son-in-law Jared Kushner on its preliminary witness list, although it has indicated it likely won't call Manafort.

The judge denied some discovery-related bids from the defense over allegedly belated production of documents from the government.

Assistant U.S. Attorney Paul Monteleoni said the government was pushing for a trial in early 2021, noting that with the resurgence of the coronavirus pandemic and associated restrictions, it would be difficult to prepare for a document-intensive case such as this one without having in-person meetings with witnesses.

"We think that early 2021 is significantly preferable to December," Monteleoni said.

Judge Schofield said the arguments were largely academic, given the uncertainty posed by the pandemic.

"We will take the first available date given our place in the queue," Judge Schofield said.

The government is represented by Paul M. Monteleoni, Douglas S. Zolkind and Benet J. Kearney of the U.S. Attorney's Office for the Southern District of New York.

Calk is represented by Paul H. Schoeman and Darren A. LaVerne of Kramer Levin Naftalis & Frankel LLP and Jeremy Margolis and Joseph J. Duffy of Loeb & Loeb LLP.

The case is U.S. v. Calk, case number 1:19-cr-00366, in U.S. District Court for the Southern District of New York.

--Editing by Jill Coffey.

---

All Content © 2003-2020, Portfolio Media, Inc.

# EXHIBIT 4



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Del. Judge Postpones Aug. Patent Trial After Cox's Virus Plea

By **Dani Kass**

Law360 (July 15, 2020, 8:58 PM EDT) -- A Delaware federal judge on Wednesday caved to Cox Communications Inc.'s plea to delay a patent infringement trial scheduled to begin on Aug. 18, given the risks posed by the COVID-19 pandemic.

U.S. District Judge Richard Andrews' oral order didn't include any information beyond agreeing to postpone the trial. Whenever it's rescheduled, Cox will be defending itself from allegations that it infringed ChanBond LLC's high-speed networking patents.

Counsel for the parties didn't immediately respond to requests for comment Wednesday.

In a Tuesday letter to the court, Cox **requested** the trial be pushed to November, by which time "the current health crisis will hopefully be under control."

This case was supposed to be the first of 13 related infringement suits filed by ChanBond to go to trial, but Cox's letter said "a trial conducted under the present circumstances will not provide a bellwether."

"Presenting all witnesses by video, and limiting the number of counsel who can appear live, might substantially impact the trial presentation," Cox said. "Many courts acknowledge that remote testimony impairs a factfinder's ability to judge credibility."

ChanBond responded that it was fine with delaying the trial, but also that it "comes as no surprise to ChanBond, as Cox and the other defendants have sought to delay trial in these matters since these cases were filed."

In addition to Cox, ChanBon has sued companies including Charter Communications Inc., Time Warner Cable Inc. and Comcast Corp. for alleged infringement of these patents. The cases were filed in 2015.

The delay comes during the same week Delaware's chief judge **rescheduled** another jury trial planned for August, this one between Sunoco and Magellan Midstream over gasoline patents. In that case, U.S. District Judge Leonard Stark scrapped an "experimental" plan to have jurors attend in-person with witnesses testifying remotely due to the pandemic. While Magellan was fine with going to trial, Sunoco pushed for the delay, citing an increase in COVID-19 cases in the state.

The patents-in-suit are U.S. Patent Nos. 7,941,822; 8,341,679; and 8,984,565.

ChanBond is represented by Robert A. Whitman, Mark S. Raskin, John F. Petrsoric, Michael DeVincenzo and Andrea Pacelli of King & Wood Mallesons and Stephen B. Brauerman of Bayard PA.

Cox is represented by Jennifer Ying of Morris Nichols Arsht & Tunnell LLP.

The case is ChanBond LLC vs. Cox Communications Inc., case number 1:15-cv-00842, in the U.S. District Court for the District of Delaware

--Additional reporting by Craig Clough and Sarah Jarvis. Editing by Daniel King.

All Content © 2003-2020, Portfolio Media, Inc.

# EXHIBIT 5



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Sunoco Patent Trial 'Experiment' Nixed After Virus Objections

By **Sarah Jarvis**

Law360 (July 13, 2020, 8:37 PM EDT) -- Delaware's chief federal judge on Monday ordered a postponement in a jury trial planned for next month between Sunoco and Magellan Midstream over gasoline patents, scrapping an earlier, experimental plan to have jurors attend in-person with witnesses testifying remotely due to the pandemic.

Chief U.S. District Judge Leonard Stark postponed the trial, which had been scheduled for August 3, after the parties wrote letters to the court on Friday and Saturday addressing delaying the trial. Sunoco Partners Marketing & Terminals LLC requested a postponement, citing increasing COVID-19 cases in Delaware, while Magellan Midstream Partners LP said the case was ready for trial.

"Although the court has attempted to fashion measures that would enable [the] trial to proceed in spite of the COVID-19 pandemic, Sunoco respectfully requests the court continue the trial dates until an in-person jury [trial] can proceed," Sunoco said.

**Early last week**, Judge Stark ruled that delaying the trial further because of the pandemic was not preferable. He had decided to hold the trial, which he called "something of an experiment," in a courtroom with jurors attending in-person, as well as the two fuel companies' lawyers and corporate representatives, though the latter groups would be extremely limited in their numbers. Meanwhile, the witnesses would have appeared by a live video link.

But Judge Stark reversed course after a teleconference with the parties Monday and continued the trial to an unspecified future date.

Sunoco said in its letter to the court that Delaware's governor extended a state of emergency order until August 6, three days after the planned trial. The company said the proposed experimental trial would "jeopardize norms favoring in-person testimony and Seventh Amendment norms regarding juror selection, leading to potentially unfair results."

The company expressed concern that the disproportionate impact the virus has had on minority communities and the elderly risks "undermining the representative nature of the jury pool."

It also said it was concerned about the "substantial economic and personal costs" to its attorneys, who the judge asked to self-quarantine for 14 days before the trial upon arriving Delaware from their home in Houston, Texas. That imposes "disproportionate burdens and harms" on them since Magellan's counsel lives in Delaware and won't have to quarantine, and no one knows whether it will be safe for the trial to take place, Sunoco said.

But Magellan said, "the parties are ready, and the case was ready for trial." The company said it would have supported a short postponement of a month or so, but added that "fundamentally, the defendants would like to put this proceeding behind them."

"At present, all defendants can assume is that the court will be conducting remote trials for the indefinite future," Magellan said. "As a result, the defendants prefer to proceed as soon as the court believes it can safely conduct a jury trial."

Sunoco brought the 2017 infringement suit against Magellan over a group of patents for blending butane into gasoline, alleging Magellan willfully infringed five patents.

In March, the Patent Trial and Appeal Board invalidated claims in two of the Sunoco patents, finding U.S. Patents Nos. 9,606,548 and 9,494,948 invalid as anticipated. Sunoco told the federal court afterward that the PTAB decisions "have no legal effect on this court, this trial, or validity until appeals are exhausted." Sunoco indicated that it plans to appeal and "expects to reverse" the PTAB decisions.

Sunoco has asserted four of the same patents in a separate case against U.S. Venture Inc. and unit U.S. Oil Co. Inc. in Illinois federal court. After a bench trial, the judge ruled in January that U.S. Venture had infringed, **awarding** Sunoco $6 million in damages — though the company had originally sought $32 million.

Counsel for all parties did not immediately respond to requests for comment Monday.

The patents-in-suit are U.S. Patent Nos. 9,494,948 and 9,606,548.

Sunoco Partners is represented by John C. Phillips Jr., David A. Bilson and Megan C. Haney of Phillips McLaughlin & Hall PA, and John Keville and Michelle Replogle of Winston & Strawn LLP.

Magellan and Powder Stream Logistics are represented by Douglas E. McCann, Martina Hufnal and Dorothy Whelan of Fish & Richardson PC and David Moreland of Meunier Carlin & Curfman LLC.

The case is Sunoco Partners v. Powder Springs et al., case number 1:17-cv-01390, in the U.S. District Court for the District of Delaware.

--Additional reporting by Cara Salvatore. Editing by Steven Edelstone.

---

All Content © 2003-2020, Portfolio Media, Inc.

# EXHIBIT 6

Case: 1:20-cv-04700 Document #: 1 Filed: 08/11/20 Page 44 of 62 PageID #:44



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# COVID-19 Delays Musk Chancery Trial To March  2021

By **Jeff Montgomery**

Law360 (July 16, 2020, 8:12 PM EDT) -- Despite weeks of precautionary planning, the Delaware Chancery again delayed a 10-day trial on the allegedly conflicted roles of Elon Musk and Tesla's directors in the company's $2.6 billion acquisition of rooftop solar company SolarCity, saying COVID-19 safety concerns persist in Delaware.

Vice Chancellor Joseph R. Slights III notified attorneys that the trial's July 27 start date had been moved to March 29, 2021, just over a year beyond the original March 16, 2020, kickoff date.

Chancery Court Administrator Susan Judge said in an email on Thursday that courtroom safety limitations and a recent extension of the current phase of a multi-step reopening plan for Delaware's courtrooms "were key factors in the decision by counsel to postpone the trial."

The original start date was moved on March 13, one day after Delaware Gov. John Carney declared a Delaware coronavirus state of emergency.

The seven stockholder suits consolidated for the trial started in 2016, and they focus on allegations that Musk and Tesla's directors misled stockholders about the solar company acquisition. Attorneys for one of the early complaints claimed that Musk and Tesla's board breached their duty in pursuing SolarCity, "a company run by Elon Musk's cousins, intertwined with Tesla in a complex web of familial and business relationships, and in which he [Musk] holds approximately $500 million of stock."

Standing in the way of getting the claims to trial is a pandemic that prompted Chief Justice Collins J. Seitz Jr. to halt all in-person oral arguments on March 16. That was followed days later by an order closing most state court buildings to the public, hours before a statewide stay-at-home order closed non-essential businesses.

Although the chief justice has since approved the second phase of the four-step reopening plan, he recently extended current restrictions to Aug. 6.

Vice Chancellor Slights and attorneys in the case had been wrestling for weeks with the logistics of the trial and concerns about partial live, in-court proceedings, including for testimony by Musk. Some members on the legal teams face particular concerns created by travel from California, which recently reimposed safety restrictions, to Delaware, which recently extended them.

Plans at the time of the delay on Thursday called for relying on Zoom and YouTube in part for remote proceedings, with direct courtroom trial access limited to, at most, eight attorneys and six members of the public. The legal teams were cautioned that they would have to shuttle to and from the courthouse as needed, with none of the space traditionally available in the building for trial "war-rooms."

Vice Chancellor Slights rejected dismissal and moved the case toward trial in March 2018, after finding it reasonably conceivable that Musk was Tesla's controlling stockholder. In the motion, the vice chancellor noted that it had been claimed that Musk has publicly maintained that Tesla, SolarCity and rocket and spacecraft company SpaceX "form a 'pyramid' on top of which he sits."

The motion pointed to claims of Musk's "domination of the board during the process leading up to the [SolarCity] acquisition against the backdrop of his extraordinary influence" within Tesla, along with

"conflicts that diminished the board's resistance to Musk's influence, and ... Musk's own acknowledgements of his outsized influence" as evidence reasonably supporting his status as controlling stockholder.

The investors are represented by Jay W. Eisenhofer, Christine M. Mackintosh, Kelly L. Tucker, Vivek Upadhya and Daniel L. Berger of Grant & Eisenhofer PA, Lee D. Rudy, Eric L. Zagar, Robin Winchester and Justin O. Reliford of Kessler Topaz Meltzer & Check LLP, and Randall J. Baron, David T. Wissbroecker and Maxwell R. Huffman of Robbins Geller Rudman & Dowd LLP.

Musk and the other director defendants are represented by David E. Ross, Garrett B. Moritz and Benjamin Z. Grossberg of Ross Aronstam & Moritz LLP, and Evan R. Chesler, Daniel Slifkin, Vanessa A. Lavely and Helam Gebremariam of Cravath Swaine & Moore LLP.

The case is In re: Tesla Motors Inc. Stockholder Litigation, case number 12711, in the Court of Chancery of the State of Delaware.

--Additional reporting by Matt Chiappardi, Rose Krebs, Vince Sullivan and RJ Vogt. Editing by Adam LoBelia.

---

All Content © 2003-2020, Portfolio Media, Inc.

# EXHIBIT 7



**Portfolio Media. Inc.** | 111 West 19th Street, 5th floor | New York, NY 10011 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# Mass. Mayor's Cannabis Extortion Trial Delayed Until 2021

By **Chris Villani**

Law360 (July 16, 2020, 3:26 PM EDT) -- A Massachusetts mayor charged with shaking down would-be marijuana businesses for their required licenses will not face a jury until January of 2021 at the earliest, a federal judge said in court Thursday, delaying the trial for the second time due to the COVID-19 pandemic.

Jasiel Correia, 28, the former mayor of the South Coast of Massachusetts city of Fall River, had been set for trial in September. But U.S. District Judge Douglas P. Woodlock said Thursday that, although trials may be back underway by then, defendants like Correia who are not being held in custody will generally have to wait.

"I think this is a case that should not anticipate going to trial until at the earliest January, and maybe not then," Judge Woodlock said during the brief afternoon status conference. "The trial date previously established is not one that is realistic in light of the pandemic and the continuing state of emergency."

When the case is tried, it's also not clear whether Correia will stand trial alongside his former chief of staff, Genoveva Andrade.

Andrade also faces charges in connection with Correia's alleged extortion of hundreds of thousands of dollars from marijuana businesses that needed his approval to open. Andrade had a tentative November date on the books in the event the two could not be tried together in September.

This is the second time the trial date has been bumped because of the health crisis. Judge Woodlock said the thought process behind the latest delay is in line with the overall plan for reconstituting in-person proceedings in the courthouse.

The waterfront Boston building, while technically "open," has been devoid of in-person hearings. Thursday's status conference took place via video conference, with Judge Woodlock seated in his courtroom and the other participants scattered across their various locations.

Judge Woodlock said the court is still in the process of figuring out how jury trials will play out and has been receiving advice from a team of epidemiologists from Tufts Medical Center.

"It appears possible that we can start jury trials maybe in September, maybe a little bit later," Judge Woodlock said. "We also have what I'll call a triage, an order of battle the court has always pursued, which is that criminal cases have priority over civil cases and criminal cases with persons in custody have priority over cases where the defendants are not in custody."

Correia's original trial date was May 29.

Prosecutors claim the former mayor, who was elected when he was only 23 years old, took advantage of his position and a Massachusetts law requiring marijuana business owners to obtain a "letter of non-opposition" from the leader of its local government in order to open.

Correia extorted bribes from at least four businesses, the government claims.

The now-former mayor was arrested twice while in office. In 2018, he was indicted on charges he **stole from investors** in an app he developed. Despite the indictment, he survived a recall election in early 2019 before being **arrested again** on the separate marijuana business extortion charges.

He is also accused of soliciting bribes from a building owner seeking permits, and prosecutors said he required Andrade to pay him half her salary in exchange for her job as chief of staff.

Correia is represented by Kevin J. Reddington.

The government is represented by Zachary Hafer and David Tobin of the U.S. Attorney's Office for the District of Massachusetts.

The case is U.S. v. Correia et al., case number 1:18-cr-10364, in the U.S. District Court for the District of Massachusetts.

--Additional reporting by Cara Salvatore. Editing by Alyssa Miller.

All Content © 2003-2020, Portfolio Media, Inc.

# EXHIBIT 8



**PUBLIC INVESTORS ADVOCATE BAR ASSOCIATION**

1225 West Main Street, Suite 126 | Norman, OK  73069
Toll Free (888) 621-7484 | Fax (405) 360-2063
www.piaba.org

Richard Berry, Esq.
Executive Vice President
Director of FINRA Dispute Resolution
Financial Industry Regulatory Authority
One Liberty Plaza
165 Broadway, 27th Floor
New York, NY 10006

Re:    **FINRA's Policy Regarding In-Person Hearings During COVID-19**

Dear Rick,

I hope this letter finds you safe and well. I write today on behalf of the Public Investors Advocate Bar Association ("PIABA") to address FINRA's postponement of all in-person hearings in response to COVID-19.[1] While FINRA's initial postponement of hearings was a sound policy when it was enacted, circumstances have since changed a great deal, requiring new and different actions as well as a new way of thinking about these issues. All parties believed at the time FINRA enacted this policy that it would be short-lived and only impact a handful of cases. However, FINRA has already extended those postponements for more than half a year and it appears FINRA may be contemplating even further postponements. Moreover, if FINRA is going to attempt to wait until COVID-19 is effectively no longer with us, it could mean in-person hearings are not conducted for many more months, or possibly even several years. Such a policy, which results effectively in indefinite postponement of many arbitration hearings, is unjustified given the available methods for mitigating the transmission of COVID-19.

It is PIABA's position that FINRA should resume in-person hearings—in compliance with applicable health and safety guidelines—beginning on September 14, 2020. While it would be preferable for some parties that FINRA begin in-person hearings immediately, we recognize that it may take some time for FINRA to put in place the necessary measures to protect all hearing participants. While it may have been possible to allow some hearings to proceed at this point, assuming the parties and arbitrators were willing to proceed, FINRA has not yet developed any procedures that would have allowed for in-person hearings. The timeframe we propose will give FINRA almost two months to implement this plan.

Moreover, this policy of moving forward within a specified time certain is necessary as it will give FINRA arbitration participants required certainty to prepare for their cases going to hearing. Currently, parties have to wait each month to hear whether or not their case is going to be postponed, creating unnecessary anxiety over the process and negatively impacting how parties

*Officers and Directors*

| | | | |
|---|---|---|---|
| President: Samuel B. Edwards, TX | Hugh D. Berkson, OH | Christine Lazaro, NY | Joseph C. Peiffer, LA |
| EVP/President-Elect: David P. Meyer, OH | Michael S. Edmiston, CA | Thomas D. Mauriello, CA | Jeffrey R. Sonn, FL |
| Secretary: Adam Gana, NY | Benjamin P. Edwards, NV | David P. Neuman, WA | Andrew J. Stoltmann, IL |
| Treasurer: Darlene Pasieczny, OR | Marnie C. Lambert, OH | Timothy J. O'Connor, NY | Robin S. Ringo, *Executive Director* |

are dealing with mediation, settlement, discovery issues and other important processes that move FINRA cases along to a timely conclusion. Rather than continue with the current FINRA plan to try and "wait out" COVID-19, it is time for FINRA to develop a plan that accepts that COVID-19 will be with us for some time and moves forward with the thought of how we "live" with COVID-19.

PIABA recognizes it is much easier to say something should happen than to actually develop a plan and make it happen. As such, PIABA is offering specific solutions on how this actually can and should happen. These suggestions are based on current CDC guidelines as well as what other arbitration forums and courts across the country are doing in light of being forced to face these same issues.

First, FINRA can safely hold in-person hearings by complying with relevant health and safety guidelines. Current CDC guidelines state that event planners can responsibly reduce the spread of COVID-19 at gatherings by encouraging participants to maintain six feet of distance, having participants wear face coverings, and keeping the environment clean and disinfected.[2] FINRA can easily comply with those recommendations, as in-person hearings rarely require close or sustained contact. Moreover, any modifications to FINRA locations would require only the minimal burden of, for example, taping arrows to the floor to direct foot traffic, or placing chairs at least six feet apart. Consequently, there is no reason that resuming in-person hearings would jeopardize participants' health, provided that FINRA is willing to take relatively minor precautions.

Second, while some parties may wish to proceed with a virtual arbitration, others believe it to be an inadequate means of addressing their grievances. For example, some attorneys believe in-person cross examination plays an important role in a hearing: by forcing the witness to speak in the solemnity of a judicial proceeding, it allows the trier of fact to "judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."[3] Other attorneys feel that allowing witnesses to testify from the comfort of their own homes—without ever being subjected to the scrutiny of an in-person hearing—is inconsistent with traditional notions of justice in our adversarial system. In the past, virtual hearings were an acceptable, albeit undesirable, alternative borne of need, but as discussed above, that time has largely passed and cannot become the default or only option for parties.

Finally, FINRA's current approach to the pandemic is out-of-step with competing dispute resolution forums. As an example, JAMS has resumed in-person hearings in major metropolitan areas such Chicago, Washington, D.C., and Boston by taking precaution in accordance with CDC guidelines.[4] Further, even as FINRA claims its arbitration services are "faster, cheaper and less complex" than traditional litigation,[5] courts across the country have resumed in-person bench trials for civil proceedings.[6] If those forums are able to simultaneously protect both the health and the interests of their litigants and still allow in-person hearings, FINRA can, and should, do the same.

For these reasons, PIABA urges FINRA to resume in-person hearings, as it can take the same precautions as numerous dispute resolution forums across the country in order to provide safe and efficient access to justice. On the following pages, PIABA lists out its proposal for going forward with in person hearings beginning in September 2020.

2

**Proposed Standards**

1. Size of Room

    a. All hearing rooms should be no less than 720 sq. ft., allowing a total of 60 sq. ft. per person in the room, making social distancing very possible.

    b. Because of the U shape of the layout for arbitration, as discussed below, it would be best for the room to be no less than 20'x36', allowing enough space to set up and move around the tables.

2. Number of participants in the room

    a. No more than 12 people should be allowed in the room at any time. This includes the following:
        i. The three arbitrators.
        ii. The Claimant
        iii. Claimant's counsel
        iv. Respondent
        v. Respondent's counsel
        vi. The witness

    b. This would mean that in most cases, a minimum of 8 people would always be in the room. To the extent that experts, additional counsel, or others need access to the hearing room, but the total number would exceed 12 people, those additional persons would have to be allowed only virtual attendance at the hearing, which can be done by streaming the hearing to a neighboring hearing room or rooms, or other site and allowing those with access to the site to watch the arbitration remotely.

3. Layout of Room

    a. To the extent possible, tables should be arranged in a U shape with a gap of at least five feet across from the inside edges of the tables constituting the legs of the "U."

    b. FINRA should endeavor to make the U as large as the hearing room will permit so that distancing can occur.

4. Chairs/Seating

    a. Arbitrators should be in the curve of the U, with the Chair in the middle and the two other arbitrators sitting six feet from the Chair.

    b. Counsel and each of the parties will each take a leg of the U, with no more than 4 chairs allowed on each side. Again, chairs should be six feet apart.

    c. A chair and table should be set up in the middle of the U for the witness.

5. <u>Barriers</u>

    a. FINRA should provide plexiglass barriers to place on the table in front of the witness so there is a physical barrier between the witness and the arbitrators.

    b. FINRA should also consider placing plexiglass barriers between the arbitrators and the parties on each side of the U.

6. <u>Face Coverings</u>

    a. Face coverings will be required at the hearing and must be worn at all times while in the hearing room by all participants, other than the testifying witness.

    b. The testifying witness, because they are behind a plexiglass barrier, will be the only person allowed to be in the room without a face covering the entire time. They must wear their face covering until they sit down at the table behind the plexiglass and must put the face covering back on before they stand up and leave the witness table.

    c. This will mean the arbitrators and the counsel who are asking questions and who may be making objections, must still have on a face covering and, as a result, may need to speak louder to make sure they are heard.

**<u>Proposed Procedures</u>**

1. <u>Personal Protective Equipment ("PPE")</u>

    a. It is undeniable that access and use of PPE is critical to increasing safety of everyone. As a result, FINRA needs to provide the necessary PPE for the participants at the arbitration to make sure that everyone has the necessary protection.

    b. FINRA should provide the following PPE and other necessary equipment to the arbitrators to use at the hearing and distribute to the participants, as needed:

        i. Cloth face masks for all participants in the arbitrator to use if they do not have their own, need an additional or prefer to use a disposable mask.

        ii. Face shields to the extent a party would prefer a face shield and possibly also to be used by testifying witnesses.

        iii. Disposable gloves for any participant who wants to use gloves (although gloves will not be required of any participant).

        iv. Hand sanitizer and sanitizing wipes sufficient for the entire arbitration hearing.

        v. A non-contact thermometer.

2.   Entering the Hearing Room

    a.   No one may enter the hearing room without a face covering.

    b.   The Chair or staff member assigned to the case will use the non-contact thermometer FINRA provides to scan each participant upon entering the hearing room every morning. If someone has a fever, they will have to be excused from the hearing location for the duration of the arbitration.

3.   Leaving the Hearing Room

    a.   Parties should take everything they will need with them as they should not be re-entering the room when it is closed. When the room is closed, it should be sanitized.

    b.   While at the hearing location, but outside of the hearing room, parties should be strongly encouraged to continue to wear a face covering.

    c.   Parties should wash their hands every time they leave the room and before re-entering to make sure they do not inadvertently bring any contagion into the hearing room from the outside.

**Proposed Locations**

1.   FINRA Dispute Resolution Offices

    a.   To the extent available, FINRA should hold as many arbitration hearings as possible at its own hearing locations.

    b.   This would allow FINRA to control the processes and make sure everyone is compliant with the best practices.

    c.   This would also allow FINRA to make sure the technology is available in each hearing room to address any component of the hearing that may need to be virtual, such as a witness who cannot travel to the location, an arbitrator the parties agree can participate remotely, as discussed below, or to broadcast the arbitration to other participants who cannot be in the room as a result of the 12-person limit.

2.   JAMS Offices

    a.   As JAMS is already moving forward in most of its offices across the country with in-person hearings and have implemented most of the procedures suggested in this letter, to the extent JAMS has an office location where hearings can be held and FINRA either does not have an office in that location, or, alternatively, cannot hold the arbitration at FINRA's offices because of space constraints or other

issues, PIABA recommends that FINRA contract with JAMS to hold arbitrations at JAMS's facilities.

b.  This would allow FINRA to continue to exert some control even though the hearing was not at FINRA's offices and it would keep FINRA from having to thoroughly review a third-party's COVID-19 procedures as JAMS is already doing most of what is suggested.

c.  JAMS should welcome this as it could create revenue for JAMS and allow space to be used that is likely not being fully utilized at this point.

3.  <u>Hotels/Business Centers</u>

a.  In locations where neither FINRA nor JAMS are available, the traditional hotels and business centers FINRA has always used will have to suffice.

b.  PIABA has confirmed that larger rooms, most exceeding the size required under PIABA's plan, are widely available nationwide. For example, PIABA obtained a list of locations across the country from Hyatt Hotels with the meeting space availability in an excel spreadsheet, and has confirmed availability.

c.  Regus centers can be acceptable in some cases, but only if it is the Regus larger conference/teaching room, not the Regus Boardroom as it is insufficient in terms of size.

d.  PIABA recommends that FINRA engage in an agreement with a particular national hotel chain in this respect, so there can be some consistency and FINRA can have a specific contract with the hotel as to how things will be handled in FINRA arbitrations including FINRA'S COVID-19 procedures.

e.  For example, FINRA has used a number of Embassy Suites, Hyatt and other hotels in the past for arbitrations. Embassy Suite hotels have a particular design and, nationally, appear to often be almost identical. FINRA could engage with a national chain like Embassy Suites, Hyatt or others to make sure a certain room size would be used for each arbitration, and that certain COVID-19 procedures, such as the sanitizing discussed below, would be followed in each arbitration. Further PIABA has confirmed that Embassy Suites and Hyatt Hotels have a wide availability of meeting rooms nationwide, that are large enough to provide social distancing during hearings.

f.  This would allow for some consistency and predictability for FINRA and the parties.

**Proposed Sanitizing Protocol**

1. At FINRA's Offices

    a. Every morning prior to the beginning of a hearing, FINRA should have the hearing room sanitized in line with the CDC's guidance.[7]

    b. During each lunch break of a hearing, FINRA should have the hearing room sanitized in line with the CDC's guidance.

    c. FINRA should provide the Chair of the Panel with a hand sanitizer and wipes large enough to last the entire week and encourage parties to use the hand sanitizer.

    d. Following the conclusion of each witness' testimony, the witness table, plexiglass shields, and any shared materials should be sanitized.

2. At JAMS

    a. FINRA should ensure that JAMS follows, at a minimum, the standards FINRA has put in place for its own locations.

    b. To the extent JAMS has additional sanitizing or safety precautions more stringent than what FINRA may require, FINRA should accept those and consider implementing them for all hearings, regardless of the location.

3. At Hotels/Business Centers

    a. FINRA should contract with each hotel or business center to make sure the hotel or business center is following FINRA's COVID-19 guidelines (this may make hotels more appropriate than some business centers, since hotels have their own cleaning staff).

    b. FINRA should provide the Chair of the Panel with a hand sanitizer and wipes large enough to last the entire week and encourage parties to use the hand sanitizer.

**Proposed Arbitrators Protocol**

1. PIABA understands that many arbitrators are concerned about the virus, especially for those arbitrators who are older or have compromising health conditions.

2. As a result, PIABA believes it would be inappropriate to force any arbitrator to participate in-person at a hearing if that arbitrator does not feel comfortable.

3. However, it is equally inappropriate for FINRA to allow arbitrators to hold up arbitrations indefinitely as it could be years before some arbitrators are comfortable with an in-person hearing.

4.  As such, PIABA recommends the following if an arbitrator indicates they are uncomfortable or unwilling to attend an in-person hearing:

    a.  The parties should be informed of this issue as soon as possible, ideally months prior to the scheduled hearing.

    b.  If the parties all agree, the arbitrator may participate virtually, rather than in-person. However, all parties will have to agree and, if any one-party objects, neither that arbitrator nor the panel should be made aware of the objecting party.

    c.  If a virtual hearing is not an option, the parties should be given a "short list" to replace the arbitrator or arbitrators who will not attend in person.

    d.  There should be absolutely no "cram down" arbitrators unless the parties agree otherwise. The default should be the "short list", not a FINRA appointment. The short list should only contain arbitrators who have indicated they are comfortable proceeding with an in-person hearing.

5.  PIABA is aware FINRA has polled panels and learned that a good portion of arbitrators indicated they will not be willing to attend in person arbitrations right now. While no party likes to lose arbitrators shortly before a hearing, PIABA appreciates that is the reality of the situation right now and believes that parties need to be made aware of the chances of this happening when they are deciding whether they want to push forward with an in-person hearing or take a different alternative.

6.  However, PIABA strongly believes the unwillingness of arbitrators to participate cannot be a determining factor in cases going forward as that will greatly undermine FINRA's mission to provide a fair and quick resolution of cases.

As has been FINRA's policy for some time, the parties should remain free to agree on how to handle hearings going forward and to agree on certain changes, as long as those changes do not impact the health or safety of any participant. For example, the parties should be able to agree to go forward with less than three arbitrators if one or more arbitrators is not willing to participate in-person. However, the parties should not be permitted to agree to reduce the health, safety and sanitation protocols (e.g., mandatory face masks, social distancing). Hopefully, this is not a controversial position as it allows FINRA to provide the parties flexibility while protecting everyone involved in the process.

The much harder issue, PIABA recognizes, is how to address what FINRA will do when the parties cannot agree on certain things, including, whether to go forward with an in-person hearing, convert the case to a virtual hearing or to postpone the hearing to a later date. Currently, FINRA has made the "default" to be that in-person hearings are postponed through early September unless the parties agree to a virtual hearing or the panel compels a virtual hearing (typically upon a customer's filing a motion). This has not been an ideal default situation as it has largely resulted in cases being postponed, some of them now more than once.

Moving forward, customers should be given the choice of how to proceed with their case: in-person or virtually. This would be consistent with FINRA Rule 12800, under which customers are given the option of proceeding with a hearing telephonically or in-person.[8] Otherwise, customers may effectively be denied access to the forum, with their cases being delayed indefinitely, which could serve as a risk to FINRA arbitration remaining viable. Customers are entitled to have their cases heard in a timely manner and failure of FINRA to accommodate that requirement will undoubtedly result in some parties seeking judicial intervention, which would not be good for either party or FINRA.

Hopefully, the parties will work together and agree on how to handle these issues, but, if not, the cases must still move forward. Indefinitely delaying the cases is not the appropriate solution. Respondents may be given the opportunity to overcome the presumption that the case will move forward in the manner chosen by the customer, which should strike the right balance between allowing all parties to have a say in the proceeding while fulfilling FINRA's stated goal of "investor protection."

PIABA has just begun working on this very difficult issue we are all facing and may ultimately "tweak" some of these recommendations as more research is done and more results from other dispute resolution forums are published. However, the above is PIABA's current position on these issues after giving it considerable thought and debate and significant research as to what health officials are recommending and how other dispute resolution forums are handling their in-person hearings. Nevertheless, PIABA is willing to discuss any of these issues and even consider changing positions if there is a persuasive reason or a clear better alternative. In the end, PIABA wants to participate in any of FINRA's decisions on in-person hearings going forward as this so greatly impacts the thousands of FINRA member's customers our PIABA attorneys represent.

We look forward to continuing our discussions with FINRA.

Sincerely,

Sam Edwards
PIABA President, 2019-2020

---

[1] *Coronavirus Impact on Arbitration & OHO Hearings*, FINRA, https://www.finra.org/rules-guidance/key-topics/covid-19/hearings (last visited July 14, 2020).
[2] *Considerations for Events and Gatherings*, Center for Disease Control (June 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/large-events/considerations-for-events-gatherings.html.
[3] *Mattox v. United States*, 156 U.S. 237, 242–43 (1895).
[4] *See, e.g.*, *JAMS Reopens Additional U.S. Resolution Centers in San Francisco and Chicago*, JAMS (June 17, 2020), https://www.jamsadr.com/news/2020/jams-reopens-additional-us-resolution-centers-in-san-francisco-and-chicago; *JAMS Reopens Additional U.S. Resolution Centers*, JAMS (June 9, 2020), https://www.jamsadr.com/news/2020/jams-reopens-additional-us-resolution-centers; *JAMS Begins Reopening U.S. Resolution Centers*, JAMS (May 28, 2020), https://www.jamsadr.com/news/2020/jams-begins-reopening-us-resolution-centers.

---

[5] *Overview of Arbitration & Mediation*, FINRA, https://www.finra.org/arbitration-mediation/overview(last visited July 14, 2020).

[6] *See generally COVID-19 Roundup: Court Closures and Procedural Changes*, 2020 WL 3816519 (July 8, 2020).

[7] *See* https://www.cdc.gov/coronavirus/2019-ncov/community/clean-disinfect/index.html.

[8] *See* FINRA Rule 12800(c)(3).

Exhibit "D"

**FINRA ARBITRATION Submission Agreement**

In the Matter of the Arbitration Between

      Name(s) of Claimant(s)

Gladys Veronica Anton
Alberto Jose Nieves

                                                    19-00474

      Name(s) of Respondent(s)

Insight Securities, Inc.
Carlos Javier Legaspy
Pershing LLC

1. The undersigned parties ("parties") hereby submit the present matter in controversy, as set forth in the attached statement of claim, answers, and all related cross claims, counterclaims and/or third-party claims which may be asserted, to arbitration in accordance with the FINRA By-Laws, Rules, and Code of Arbitration Procedure.

2. The parties hereby state that they or their representative(s) have read the procedures and rules of FINRA relating to arbitration, and the parties agree to be bound by these procedures and rules.

3. The parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of FINRA Office of Dispute Resolution or the arbitrator(s). The parties further agree and understand that the arbitration will be conducted in accordance with the FINRA Code of Arbitration Procedure.

4. The parties agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement. The parties further agree that a judgment and any interest due thereon, may be entered upon such award(s) and, for these purposes, the parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5. The parties hereto have signed and acknowledged the foregoing Submission Agreement.

3/28/19
Date

Carlos Javier Legaspy
State Capacity if other than individual (e.g., executor, trustee, corporate officer)


LC43A: SUBMISSION AGREEMENT
idr: 06/13/2016

RECIPIENTS:
Nicholas P. Iavarone, Esq., Carlos Javier Legaspy
The Iavarone Firm, P.C., 33 North LaSalle, Suite 1400, Chicago, IL 60602